```
            IN THE UNITED STATES DISTRICT COURT
           FOR THE WESTERN DISTRICT OF TENNESSEE
                      WESTERN DIVISION
```

_____

UNITED STATES OF AMERICA,            )
                                     )
    Plaintiff,                       )
                                     )
vs.                                  )   No. 09-20324 MaV
                                     )
                                     )
ROBIN PERRY,                         )
                                     )
    Defendant.                       )

_____

    REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS
_____

       The defendant, Robin Perry, has been charged in an indictment with possessing a firearm as a convicted felon in violation of 18 U.S.C. § 922(g).  Before the court is the July 26, 2010 motion to suppress all evidence, including any evidence or statements obtained by law enforcement officers during and after a warrantless search of Perry's room located in a boarding house at 1710 Callis, Memphis, Tennessee, on January 22, 2009.  Perry brings the motion on the grounds that the search was unconstitutional under the Fourth Amendment and any evidence seized pursuant to the search must be suppressed.  Specifically, Perry seeks to suppress a firearm found during the warrantless search of her room and also seeks to suppress statements attributed to her during the time of her arrest.  The government filed a timely response in opposition. The  motion was referred to the United States Magistrate Judge for a report and recommendation.

The court held an evidentiary hearing on November 15, 2010. At the hearing, the government called four witnesses: (1) Fred Malcolm Tibbs, Sr.; (2) Reginald Dancy; (3) Officer Guy Hendree; and (4) Officer Bob Parker.  The defense did not call any witnesses to testify.  The parties introduced a total of eight exhibits into evidence: (1) Photograph of the boarding house; (2) Photograph of the stairway in the boarding house; (3) Photograph of Perry's bedroom; (4) Photograph of Perry's bedroom; (5) Photograph of Perry's bedroom; (6) Photograph of Perry's bedroom; (7) Photograph of Perry's bedroom; and (8) Perry's Record of Ticket ("Arrest Ticket").  After careful consideration of the statements of counsel, the testimony of the witnesses, the evidentiary exhibits, and the entire record in this case, the court submits the following findings of fact and conclusions of law and recommends that the amended motion to suppress be denied.

I.   THE TESTIMONY AT THE HEARING

On January 22, 2009, the Memphis Police Department ("MPD") responded to two separate incidents which took place at a boarding house located at 1710 Callis Street, Memphis, Tennessee.  The boarding house has three rooms downstairs and three rooms upstairs. Five people lived in the boarding house on the date in question.

The first incident occurred in the morning of January 22, 2010. Fred Malcolm Tibbs, Sr.,[1] a resident at the boarding house, testified that he called the MPD after Perry threatened him with a gun. Tibbs lived downstairs at the boarding house. Tibbs testified that on that day, after he came home from work around 5:45 a.m., Perry knocked on his bedroom door to pick up cigarettes and Vodka that he had purchased for her at her request. Tibbs gave Perry the items, and she went back to her bedroom, which was located upstairs in the boarding house. Tibbs further testified that, after a short time, Perry knocked on his door again and asked if she could use his ironing board. When Tibbs told her that she could have it but that he wouldn't take it upstairs, Tibbs testified that Perry left. Perry came downstairs a third time and asked if Tibbs wanted to come up to her room and drink coffee. According to Tibbs, he was involved in a on-again, off-again sexual relationship with Perry. Tibbs testified that he told Perry that he did not want to come up because he needed to sleep before he had to go to his second job. Finally, Tibbs said that Perry came down to his bedroom a fourth time, dressed for work, with a gun in her hand. According to Tibbs, Perry threatened him, cussed at him, and stuck the gun to his neck and to his head. Tibbs said that he told Perry to leave and closed his door on her, laid down, and then

---

[1] Tibbs has a prior felony conviction for burglary of a building. At the time of the evidentiary hearing, Tibbs was being held in state custody on pending charges.

after a very brief period of time, called the police.  When the police arrived at the boarding house 45 to 50 minutes later, Perry was no longer present and no arrest was made.

Tibbs also testified that he heard Perry consent to have her room searched when the police returned later that evening in connection with the second incident.  Tibbs first stated that the police asked Perry whether they could come into her room and that "she didn't say no."  However, on cross examination, Tibbs said that the cops asked Perry if she had an objection to them searching her room and Perry said "no."  When asked again, Tibbs said that he did not hear Perry say "no." Tibbs then stated that he did not hear her say, "No, you can't come in my room."  Finally, on re-direct examination, Tibbs testified that he heard Perry say, "Yes" in response to whether the officers could search her room.

The second incident occurred in the evening of January 22, 2009.  Around 9:00 p.m., the MPD received a second assault call from the boarding house.  Reginald Dancy, another resident living in a room upstairs in the boarding house, testified that Perry had threatened him with a gun.  According to Dancy, he arrived home to the boarding house around 9:00 p.m., and on his way upstairs to his bedroom, he heard a conversation taking place between Perry and the landlord of the boarding house, Leon Freeman.  Dancy stated that he heard Freeman telling Perry that he wanted Perry to move out because there had been a complaint that she used a gun to threaten

one of the residents. As Perry was walking up the stairs, Dancy heard Perry, from inside his room, yell that she was going to pull a gun on someone when she got upstairs. Dancy further testified that when he walked out of his room upstairs, Perry was in the hall with a gun, asking him whether he had complained about her. Dancy testified that the reason Perry asked if he had complained about her was because approximately a week or so earlier Perry had threatened him with a gun. Perry said that on that occasion he was awakened by Perry yelling at another resident. When he went out into the hall and told her she had woken him up, Dancy said they got into a short argument and that Perry pulled a gun on him. Dancy said, however, that he had not told anyone about that night.

According to Dancy, after he told Perry that he had not been the one to complain, he retreated into his room, but Perry followed him and threatened to kill him. Dancy stated that he asked Perry to leave his room several times. After Perry left Dancy's room, Dancy said he called Freeman, the landlord, on his cell phone. Freeman told him that the police were on their way.

Dancy testified he heard the police arrive; from inside his room he heard their walkie-talkies and he heard them "rack" a gun. Then, he heard one of the officers ask "Who is Robin Perry," and he heard her respond, "I am." Dancy testified that the police then handcuffed her. He heard them ask if she had a gun, what room was hers, and for permission to search her room. He testified that

5

Perry denied having a gun but granted the officers permission to search her room. Dancy stated that he could not remember the exact words used. He also testified that there had been two other people in Perry's room but he believed they left before the police arrived. He also stated that the police interviewed him on the scene and at the police station.

Two law enforcement officers with the MPD, Guy Hendree and Bob Parker, testified that they responded to the assault call on the night of January 22, 2009. Officer Hendree testified that the dispatcher sent out an "armed party call - woman with gun threatened to shoot." Officer Hendree recalled that when they arrived at the boarding house, Freeman and both victims, Tibbs and Dancy, informed them that there was an armed female inside that had threatened them with a gun. Officer Parker recalled that when they first arrived, they talked to Freeman and only one victim, who both informed them that Perry was armed and upstairs. Officer Parker's testimony was consistent with Dancy's testimony. Dancy testified that he was upstairs in his room when the officers arrived and that he talked to the police later, after Perry was located and arrested.

Officer Hendree further testified that he and Officer Parker walked into the boarding house, accompanied by the landlord and one victim, and then went upstairs to find Perry. Officer Hendree stated that because this was a hostile environment, he "racked" a

bullet into his shotgun while they located Perry.  As soon as the officers got to the top of the stairs, they encountered Perry, who was standing in the hall with the door to her room open.  The officers advised Perry to put her hands up, and the officers detained her.  Officer Hendree stated that while he handcuffed Perry and patted her down, his shotgun was slung over his shoulder.  Officer Parker testified that he had also put his gun away at that point.

　　According to the officers, after they detained Perry, they asked her if she was in possession of a firearm.  Both officers testified that Perry denied having a gun and that she gave verbal consent for them to search her room.  Officer Hendree testified that Perry told them that she did not have a weapon and offered for them to search her room.  Officer Parker testified that they asked Perry if they could search her room to see if she had a gun and that she said, "yes."  Officer Parker further testified that, after Perry gave consent, he went into her room and immediately observed the handle of a firearm with a black handle, sticking out from under a pillow on her bed.  According to Officer Hendree, the firearm matched the descriptions given by both Dancy and Tibbs, that is, a large gun, maybe a .38 or .357, with a black handle and a gray barrel.[2]

---

[2]　　Dancy testified that he told the police it was a black .357.  In the arrest ticket, Officer Hendree wrote "Vic: Dancy, Reginald told officers that def: Perry, Robin pulled a large

The pictures of Perry's room (Exhibits 3-7) illustrate that Perry's room was very small and that her bed was located in very close proximity to and nearly touching the open bedroom door.

After locating the firearm, the officers promptly arrested Perry. As they escorted Perry out of the boarding house, both officers testified that Perry was belligerent and cussing. Officer Hendree, Tibbs, and Dancy testified that as Perry was escorted out of the boarding house, she threatened to kill everyone when she returned. Officer Parker recalled that Perry was cussing, but stated that he could not discern what exactly she was saying. Officer Hendree testified that Perry claims she drank two forty-ounce beers prior to her arrival.

Officer Hendree detailed Perry's arrest in the arrest ticket. (Ex. 8.) Officer Hendree wrote that after the officers located and detained Perry, they performed a protective sweep of the premises and found a black handled revolver sticking out from under Perry's pillow. The arrest ticket did not state that Perry gave verbal consent to search her room. When asked why he did not write about Perry's consent, Officer Hendree explained that he fills out a lot of paperwork and sometimes he merely leaves out details.

---

revolver that was gray with a black handle. He also advised that it was either a .38 caliber or a .357." (Ex. 8.)

II. PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

In her brief, Perry contends that all evidence seized and statements attributed to her during and after the search of her room should be suppressed because, despite the testimony to the contrary, she did not give the officers verbal consent to search her room. Perry's counsel also asserted in the closing argument that even if the court found that Perry gave consent, her consent was not voluntary. In opposition, the government contends that the warrantless search was valid under the Fourth Amendment because Perry gave valid, verbal consent to search her room. In the alternative, the government argues that the search was a proper *Buie* sweep.

Perry's motion to suppress raises three issues: (1) Whether Perry consented to the search; (2) If so, whether the consent given was valid; and (3) If no consent was given, whether the officer's warrantless search of Perry's room was lawful as a *Buie* sweep.

A. <u>Whether Perry Consented to the Search of her Room</u>

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. Warrantless searches and seizures are considered "per se unreasonable - subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967). A search conducted with the individual's voluntary

9

consent is one of these exceptions. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). Consent may be expressly given or implied by the individual's conduct. *See United States v. Carter*, 378 F.3d 584, 587-88 (6th Cir. 2004)(holding that an individual gave consent when he stepped back, away from his door to allow police to enter after the officers asked if they could come in). When the defendant denies having given consent, the government has the burden to show by "clear and positive testimony" that consent was given. *United States v. Scott*, 578 F.2d 1186, 1188 (6th Cir. 1978).

In the case at bar, both parties agree that the protections of the Fourth Amendment applied to Perry's room in the boarding house. Perry claims in her brief that she did not give consent to the officers to search her room and thus, the warrantless search was invalid. Specifically, she alleges the "officers . . . search[ed] [her] room . . . multiple times and over the objections of Ms. Perry." The government, however, asserts that Perry gave verbal consent to Officers Hendree and Parker.

Where there are two competing accounts of the events surrounding a warrantless search, the court must make a finding of fact based on the credibility of the witnesses it observes at the suppression hearing. *United States v. Clark*, 377 Fed.Appx. 451, 454-55 (6th Cir. 2010). When weighing credibility of the witnesses, the court may consider which story is more plausible,

10

whether there are inconsistencies in the witness' testimony, and whether the defendant is a "sophisticated and experienced criminal." *United States v. Van Shutters*, 163 F.3d 331, 336 (6th Cir. 1998)(finding consent based on officers' testimony despite noting certain inconsistencies).

Whether Perry gave consent to search her room is a finding of fact contingent on the credibility of the testimony given at the suppression hearing. The court finds that the testimony of Officer Hendree, Officer Parker, Dancy, and Tibbs to be credible. Every witness described the second incident with particularity and, for the most part, each testimony corroborated the others' testimony. All four witnesses testified that they heard Perry consent to have her room searched. While there were slight discrepancies in the witnesses' descriptions of how Perry verbally gave consent, all four of the witnesses testified that she did indeed give consent to search her room. Moreover, Dancy's testimony as a whole was consistent with Officer Parker's testimony, particularly that he heard Perry give the officers verbal permission to search her room. None of the witnesses testified that Perry objected to the search.

The fact that each witness recalled a slightly different version of how Perry gave consent is not a strong enough argument to persuade the court that consent was not given. And, the other minor discrepancies between the witnesses' testimony are insignificant and do not affect their credibility. For example,

11

whether Dancy told Officer Hendree the gun was gray with a black handle or black does not render Dancy or Hendree's testimony unbelievable.

More importantly, the defendant did not introduce any witnesses to contradict the testimony of the government's witnesses as to verbal consent nor did she testify herself that she did not give consent or objected to the search. In fact, there was no proof whatsoever that Perry refused consent or objected to the search of her room.

The witnesses' testimony was consistent in all major respects and there were no witnesses who testified that Perry refused to consent or that she objected to the search. Accepting the witnesses' testimony as fact, the court finds that Perry consented to the search of her room.

B. <u>Whether Perry's Consent was Valid</u>

An individual's consent is valid only if it is knowing and voluntary. *Bustamonte*, 412 U.S. at 219. The voluntariness of consent is a question of fact, determined from the totality of the circumstances. *Id.* at 222. Relevant factors that the Sixth Circuit has considered when determining whether consent was voluntary include the defendant's age, education, and intelligence; evidence of duress or coercive activity; whether the individual had knowledge of the right to refuse consent; and the length and nature of the officers' questioning. *United States v. Canipe*, 569 F.3d

12

597, 603 (6th Cir. 2009). No single factor is dispositive. For instance, consent can be found voluntary even if the officers did not warn the individual of the right to refuse consent or the individual was handcuffed at the time consent was given. *See Bustamonte*, 412 U.S. at 226 ("While the state of the accused's mind, and the failure of the police to advise the accused of his rights, were certainly factors to be evaluated in assessing the 'voluntariness' of an accused's responses, they were not in and of themselves determinative.")(internal citations omitted); *United States v. Burns*, 298 F.3d 523, 541 (6th Cir. 2002)(holding that consent was not invalidated simply because the individual was handcuffed at the time consent was given).

Upon examination of the relevant factors, this court finds that Perry voluntarily consented to the search of her room. According to the arrest ticket, Perry was 42 years old at the time of the arrest. The government submits in its memorandum that Perry is an experienced criminal.[3] Although Perry was put in handcuffs, the officers testified that Perry's detention was for the officers' safety and that the duration was very brief. As stated above, the fact that Perry was handcuffed alone does not make her consent involuntary.

---

[3] The government states that Perry's Pretrial Services report prepared for her bond hearing indicates that she has been arrested fifty-seven times for offenses dating back to 1988. However, the government did not put on any proof at the evidentiary hearing as to Perry's sophistication as a criminal.

The officers did testify that they heard Perry say she had two forty-ounce beers before their arrival but Perry introduced no proof of her alcohol consumption that evening. Regardless, "the mere fact that an individual is intoxicated does not render consent involuntary." *See United States v. Scheets*, 188 F.3d 829, 830-831 (7th Cir. 1999)(holding that the consent was voluntary though the defendant was somewhat intoxicated because the officers did not use coercion and there was no evidence that the defendant was not aware of what he was doing).

Neither side put on any proof at the evidentiary hearing as to Perry's education or intelligence. On January 21, 2010, Judge Samuel H. Mays, the presiding district judge, ordered Perry to undergo a mental evaluation. There is nothing further in the record, however, to indicate any finding that she was not mentally competent at the time of the incident or at the present. Perry attended the evidentiary hearing and appeared to consult with her counsel and to understand the testimony. Perry did not offer any proof whatsoever to rebut the government's argument that her consent was voluntary. Because Perry's detention was brief and there is no evidence that the officers used force or coercion when asking for her consent, the court concludes that Perry's consent was voluntary.

C.   Whether the Gun was Discovered During a Valid *Buie* Sweep

Although the court has found that the warrantless search was valid because it was conducted with Perry's consent, the court will

14

also evaluate whether the officer's search was a valid *Buie* sweep. The Supreme Court, in *Maryland v. Buie*, 494 U.S. 325, 334 (1990), held that officers may conduct a protective sweep of spaces immediately adjoining the place of an arrest occurring inside a home "as a precautionary matter and without probable cause or reasonable suspicion."  The court also held that the protective sweep may extend to a non-adjoining area if officers have a "reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene."  *Id.* at 337.  A protective sweep is a "quick and limited search of the premises, incident to an arrest and conducted to protect the safety of the police officers and others."  *Id.* at 327.  Items in plain view may be seized during a protective sweep if its incriminating character is readily apparent.  *Id.* at 330. The Sixth Circuit holds that a proper *Buie* sweep may encompass looking in closets and under beds to ensure that no one is hiding there.  *See United States v. Lanier*, 285 Fed.Appx. 239 (6th Cir. 2008)(holding that an officer did not exceed the scope of a *Buie* sweep when, after arresting and escorting defendant from his room, the officer looked between a mattress and box springs because there was plenty of room for someone to hide there).

Perry argues that the search was not a proper *Buie* sweep because (1) the sweep did not occur in a place immediately adjoining the place of arrest and (2) the officers cannot

15

articulate a basis for believing that a third party was present who posed a danger to the arresting officers. The court disagrees. The officers arrested Perry in the upstairs hallway of the boarding house, just outside of her open bedroom. The pictures of Perry's bedroom, Exhibits 3-7, show that only a very short distance exists from the hallway to Perry's bed. Officer Hendree testified that they conducted a protective sweep because there was someone upstairs talking to Perry when they arrived and they did not know whether there was anyone else in Perry's room. Because this hostile situation was taking place in a boarding house where several residents lived, it is reasonable that the officers felt the need to conduct a protective sweep for their safety. Even if the officers had no articulable facts from which to infer that another individual was hiding in the room, the standard for a protective sweep is less stringent. As stated above, the officers may conduct a protective sweep merely as a precautionary measure. Based on the evidence submitted, the court concludes that the officers conducted a proper protective sweep.

### III. RECOMMENDATION

For the reasons expressed above, it is recommended that Perry's motion to suppress be denied.

Respectfully submitted this 23rd day of November, 2010.

s/Diane K. Vescovo
DIANE K. VESCOVO
UNITED STATES MAGISTRATE JUDGE