IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

---

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   No. 09-20324 |
| | ) |
| ROBIN PERRY, | ) |
| | ) |
| Defendant. | ) |

---

### ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS AND ADOPTING MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

---

Before the Court are Defendant Robin Perry's ("Perry") July 26, 2010 Motion to Suppress and Perry's Objections to the Report and Recommendation of Magistrate Judge Diane K. Vescovo. (See Mot. to Suppress, ECF No. 43 ("Def.'s Mot."); Def.'s Objections to Report and Recommendation, ECF No. 68 ("Def.'s Objections").) The Magistrate Judge recommended that the Court deny Perry's motion to suppress. (Report and Recommendation on Def.'s Mot. to Suppress, ECF. No. 63.) ("Report") For the following reasons, Perry's objections are OVERRULED. The Magistrate Judge's Report is ADOPTED, and the Motion to Suppress is DENIED.

### I. Background

On August 25, 2009, the grand jury returned an indictment charging Perry with one count of possession of a firearm after having been convicted of a felony, in violation of 18 U.S.C. §

922(g).  (See Indictment, ECF No. 1.)  Perry filed a motion to suppress a firearm and statements obtained by law enforcement officers during a January 22, 2009 warrantless search of Perry's room in a boarding house in Memphis, Tennessee.  (See Def.'s Mot. 1-2.)  The Motion was referred to the Magistrate Judge on July 27, 2010, and Plaintiff United States (the "Government") responded on August 16, 2010.  (See Order of Reference, ECF No. 45; Resp. of the United States to the Def.'s Mot. to Suppress, ECF No. 47.)

The Magistrate Judge held a hearing on November 15, 2010. (ECF No. 59.)  At that hearing, the Government called four witnesses: 1) Fred Malcom Tibbs, Sr. ("Tibbs"), 2) Reginald Dancy ("Dancy"), 3) Officer Guy Hendree ("Hendree") of the Memphis Police Department ("MPD"), and 4) Officer Bob Parker ("Parker") of the MPD.  (See Report 2.)  Perry did not testify or call any witnesses.  (See id.)  The parties introduced eight exhibits: a photograph of the boarding house, a photograph of the stairway in the boarding house, five photographs of Perry's bedroom, and Perry's Record of Ticket ("Arrest Report").

Based on that evidence, the Magistrate Judge recommended that the Court deny Perry's motion, filing her Report on November 23, 2010.  (See Report 2.)  Perry filed timely objections, to which the Government has not responded.  (See Def.'s Objections.)

On January 22, 2009, five people were living in a six-room boarding house in Memphis. (Report 2.) Dancy, Perry, and Tibbs were three of the five residents. (See id.) The charges pending against Perry stem from two incidents at the boarding house that day. (See id.)

The first incident occurred in the morning, when, according to Tibbs, Perry threatened him with a gun. (Report 3) Tibbs lived in one of the three rooms located on the first level of the boarding house. (Id.) Tibbs testified that, shortly after he had returned from work around 5:45 a.m., Perry knocked on his door to pick up cigarettes and vodka that Tibbs had purchased for her. (Id.) Perry took the items to her room on the second floor of the boarding house. Tibbs further testified that, after a short time, Perry returned to his room and asked to use his ironing board. (Id.) When Tibbs permitted her to use the ironing board, but refused to carry it upstairs for her, Perry left without it. (Id.) According to Tibbs, Perry returned a third time and asked if he wanted to come up to her room and drink coffee. (Id.) After Tibbs told Perry he did not want to come up because he needed sleep before his second job, Perry left. (Id.) Tibbs testified that Perry returned to his bedroom a fourth time with a gun in her hand. (Id.) According to Tibbs, Perry threatened him, cursed at him, and pressed a gun against his head and neck. (Id.) Tibbs told Perry to leave and

3

closed the door on her.  (Id.)  After lying down briefly, Tibbs called the MPD.  (Id. 3-4.)  When the police arrived 45 to 50 minutes later, however, Perry had already left the boarding house for work.  (See id. 4.)

The second incident occurred in the evening when, around 9 p.m., the MPD received a second call from the boarding house. (Id.)  Dancy, who lived in a room on the second floor, testified that Perry had threatened him with a gun.  (Id.)  According to Dancy, as he ascended the boarding house's stairs around 9 p.m., he overhead Leon Freeman, the landlord, telling Perry that she needed to move out of the boarding house because he had received a complaint that she had threatened one of the other residents with a gun.  (Id. at 4-5.)  Dancy testified that, after he had arrived in his room, he heard Perry ascending the stairs while yelling that she was going to pull a gun on someone when she got upstairs.  (Id. at 5.)  Dancy further testified that, when he walked out of his room, Perry was in the second-floor hall with a gun asking whether he had complained about her.  (Id.) According to Dancy, approximately a week before the incident, Perry had threatened him with a gun, but he had not told anyone. (Id.)  Dancy testified that he told Perry he had not complained about her and retreated to his room, where Perry followed and threatened to kill him.  (Id.)  When Perry eventually left,

Dancy called Freeman, who told him that police were on their way to the boarding house. (Id.)

In response to a dispatcher's call about an "armed party . . . woman with gun threatened to shoot," Hendree and Parker went to the boarding house. (Id. at 6.) Hendree testified that, when they arrived, Dancy, Freeman, and Tibbs told them that there was an armed female inside who had threatened them with a gun. (Id.) Parker testified, however, that when they first arrived, they spoke with Freeman and only one victim, who informed them that Perry was armed and on the second floor. (Id.) Parker's account corresponds with Dancy's testimony that he was in his room when the officers arrived. (Id.)

Although Hendree testified that both victims met the officers outside the boarding house, he also testified that he and Parker entered the boarding accompanied by Freeman and only one victim. (Id.) Hendree stated that, because they were entering a hostile environment, he "racked" a bullet into his shotgun as they ascended the boarding house's interior stairs. (See id. at 6-7.) Hendree further testified that, when they got to the top of the stairs, they found Perry standing in the hall with the door to her room open. (Id. at 7.) The officers immediately detained her. (Id.) When they handcuffed Perry and patted her down, Parker had put his gun away, and Hendree had slung his shotgun over his shoulder. (Id.)

Both officers testified that Perry denied possessing a handgun and gave verbal consent for a search of her room. (Id.) Hendree testified that Perry offered to let them search her room. (Id.) Parker testified that she said "yes" when asked if they could search her room to see if she had a firearm. (Id.)

Dancy also testified that Perry consented to a search of her room. (Report 4.) He testified that he heard the police arrive from inside his room because he heard their radios and the sound of someone loading a gun. (Id.) He then heard one of them ask, "Who is Robin Perry?" (Id.) According to Dancy, Perry responded, "I am." (Id.) The officer then handcuffed Perry and asked her if she had a gun, which room was hers, and for consent to search her room. (Id.) Dancy testified that Perry denied having a gun, but gave consent to search her room, although he could not remember the exact words she used. (See id. at 6.) He further testified that two other people had been in Perry's room, but they had left before the police arrived. (Id.)

Tibbs also testified that he heard Perry give consent to search her room. (Id. at 4.) Tibbs initially testified that Perry "didn't say no" to the officer's request for consent. On cross examination, after first stating that Perry said "no" when asked if she objected to a search, Tibbs stated that he did not hear her object. (See id.) On re-direct examination, however,

Tibbs testified that he heard Perry answer "yes" in response to the officer's request to search her room. (Id.)

According to Parker, after Perry gave consent, he entered her room and immediately saw the black handle of a firearm protruding from under a pillow on Perry's bed. (Id.) Hendree testified that the firearm matched descriptions of Perry's firearm given by Dancy and Tibbs. (Id.) Photographs submitted at the hearing demonstrate that Perry's bed was located next to the bedroom door. (Id. at 8.)

After locating the firearm, the officers arrested Perry. (Id.) Dancy, Hendree, and Tibbs testified that, as she was escorted from the boarding house, Perry threatened to kill everyone when she returned. (Id.) Parker testified that Perry was cursing but that he could not understand her statements. (Id.) Hendree testified that Perry claimed she had consumed two forty-ounce beers before she arrived at the boarding house that evening.

Hendree detailed Perry's arrest in the Arrest Report. (Id.) He wrote that, after the officers had located and detained Perry, they conducted a protective sweep of the premises and found the black-handled firearm protruding from her pillow. (Id.) The Arrest Report does not state that Perry consented to the search of her room. (Id.) When asked why he did not note Perry's consent on the Arrest Report, Hendree

testified that he sometimes leaves out details because he completes a lot of paperwork.  (Id.)

## II.  Standard of Review

"A district judge must determine de novo any part of a magistrate judge's disposition that has been properly objected to."  Fed. R. Civ. P. 72(b); 28 U.S.C. § 636(b)(1)(C).  After reviewing the evidence, the court is free to accept, reject, or modify the proposed findings or recommendations of the magistrate judge.  28 U.S.C. § 636(b)(1)(C).  The district court need not review—under a de novo or any other standard—those aspects of the report and recommendation to which no specific objection is made.  Thomas v. Arn, 474 U.S. 140, 150 (1985).  The district court may adopt the findings and rulings of the magistrate judge to which no specific objection is filed.  Id. at 151.

## III. Analysis

Perry objects to three findings of fact and conclusions of law by the Magistrate Judge: 1) that she consented to a search of her room, 2) that her consent was valid, and 3) that, even if she did not give valid consent to the search, it constituted a lawful protective sweep.  (See Objections 1-6.)

### A. Consent to Search

Perry objects to the Magistrate Judge's finding that she gave consent to search her room.  (Objections 1-4.)  Although

8

the Fourth Amendment bars unreasonable searches, "[i]t is well-settled that a person may waive [her] Fourth Amendment rights by consenting to a search." United States v. Howard, 216 F. App'x 463, 469 (6th Cir. 2007) (quoting United States v. Carter, 378 F.3d 584, 587 (6th Cir. 2004)) (internal quotation marks omitted). "Consent to a search may be in the form of words, gesture, or conduct." Id. (citations omitted); see also Carter, 378 F.3d at 587-88 (concluding that a defendant gave consent by stepping away from his door to allow police to enter in response to their request). The government has the burden to show by "clear and positive testimony" that consent was given. United States v. Scott, 578 F.2d 1186, 1188 (6th Cir. 1978).

Where the issue of consent depends on the credibility of witnesses, district courts have significant discretion to credit one account over another. United States v. Dillard, 438 F.3d 675, 681 (6th Cir. 2006) (explaining that credibility determinations are reviewed for clear error and that an appellate court "accords great deference to such credibility determinations") (citation and internal quotation marks omitted). When weighing credibility, courts may consider whether the testimony is plausible, whether there are inconsistencies in witness' testimony, and whether the defendant is a "sophisticated and experienced criminal." See United States v. Van Shutters, 163 F.3d 331, 336 (6th Cir. 1998).

"[M]inor potential inconsistencies and memory lapses in the testimony of the government's witnesses . . . do not indicate lack of credibility" when those inconsistences are "peripheral to the heart of the testimony." Nash v. United States, 117 F. App'x 992, 992-93 (6th Cir. 2004).

Perry argues that the Magistrate Judge credited the testimony of the Government's witnesses, Dancy, Hendree, Parker, and Tibbs, despite numerous inconsistencies in their accounts. (See Objections 1-4.) Perry argues that Tibbs' testimony is not credible because, when asked whether Perry gave consent, he initially testified that she "didn't say no," then testified that she said "no" when asked if she objected to a search, then testified that he did not hear her say "no," and, finally, testified that she said "yes" when asked for permission to search her room. (Objections 2; see also Report 4.) Perry also argues that Hendree's testimony that she consented "by simply volunteering that the officers search her room" conflicts with the testimony of Dancy, Parker, and Tibbs, all of whom stated that Perry gave verbal consent after the officers asked for permission to search her room. (Objections 1-3; see also Report 4, 6-7.) Finally, Perry points to the "deafening silence of the [A]rrest [R]eport," which includes three statements Perry made in the officers' presence, but does not mention her consent. (See Objections 3-4.)

10

Despite Perry's arguments to the contrary, the Court finds that the testimony of Dancy, Hendree, Parker, and Tibbs is credible on the issue of consent.  All four witnesses testified that Perry verbally consented to the search of her room.  (See Report 4, 6-7.)  Although the witnesses did not agree on the specific language that Perry used to give consent or whether that consent came in response to a police request, consent may be manifested in any number of ways, including non-verbally. See  Howard,  216 F. App'x at 469 ("Consent to a search may be in the form of words, gesture, or conduct.")  Because the witnesses uniformly agree that Perry gave consent, their testimony on that point is credible, despite their minor discrepancies.

Perry attempts to undermine the testimony of the Government's witnesses by pointing to additional inconsistencies in their accounts of the incidents at the boarding house. (See e.g.,  Objections 2-3.) For example, Perry emphasizes that 1) Hendree's testimony that he and Parker met Dancy and Tibbs outside the boarding house conflicts with Dancy's testimony that he was in his room when the police arrived and Parker's testimony that the officers met only Freeman and one victim outside the boarding house, 2) Dancy's testimony that Perry was not handcuffed at the time of the search conflicts with Hendree's testimony that she was handcuffed when the search

11

occurred, and 3) Dancy's testimony that he told police he saw Perry with a black gun contradicts Hendree's testimony that Dancy reported that he had seen Perry with a grey gun. (See Objections 2-3.) Those inconsistencies, however, do not relate to whether Perry consented to the search of her room and are not sufficiently material to affect the witnesses' credibility.

The "heart of the testimony" by the Government's witnesses is that Perry gave consent to the search. See Nash, 117 F. App'x at 992-93. Because "minor potential inconsistencies and memory lapses in the testimony of the government's witnesses . . . do not indicate lack of credibility," inconsistencies among four witnesses about collateral issues such as how many people met the police officers outside the boarding house, whether Perry was handcuffed during the search, and whether her gun was black or grey, do not show that their testimony on the consent issue-a critical issue for the motion to suppress-is not credible. See id.

As the Magistrate Judge noted, there is no testimony contradicting the testimony of the Government's witnesses. (See Report 11.) The only proof that could possibly be construed as supporting Perry's argument that she did not give consent is the Arrest Report, where Hendree failed to state that Perry gave consent and instead wrote that the officers discovered the firearm when they conducted a "protective sweep." (See id.)

Perry essentially asks the Court to infer from the Arrest Report's silence that she did not give consent. (See Objections 3-4.) Although that silence gives the Court pause, the Arrest Report does not directly contradict the Government's witnesses' testimony. For that reason, the Arrest Report does not undermine the credibility of four independent witnesses, all of whom stated that the Perry gave consent.

Considering the issue de novo, the Court concludes that the testimony of the Government's witnesses should be credited over any inference that might be drawn from the Arrest Report, the only evidence that might support Perry's position. Perry consented to the search of her room. Perry's objection to the finding of that fact by the Magistrate Judge is not well-taken.

### B. Voluntariness of Consent

Perry also objects to the Magistrate Judge's finding that her consent was voluntary. The government has the burden to show that an individual's consent to a warrantless search "was freely and voluntarily given and was not the result of coercion, duress, or submission to a claim of authority." United States v. Arnold, 486 F.3d 177, 213 (6th Cir. 2007) (citing United States v. Wellman, 185 F.3d 651, 657 (6th Cir. 1999)). Whether those requirements have been met is a question of fact determined by the totality of the circumstances. See United States v. Canipe, 569 F.3d 597, 602 (6th Cir. 2009) (citing

Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973)).  Relevant factors include:

> the accused's characteristics and the details of the interrogation, including the youth of the accused, his lack of education, his low intelligence, the lack of any advice to the accused of his constitutional rights, the length of the detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep.

Canipe, 569 F.3d at 603 (citing Bustamonte, 412 U.S. at 226). "No single factor is dispositive of the analysis." United States v. Bradley, 163 F. App'x 353, 357 (6th Cir. 2005) (citing Bustamonte, 412 U.S. at 226.

The Magistrate Judge correctly concluded that, under the totality of the circumstances, Perry's consent was voluntary. See Canipe, 569 F.3d at 603.  Although the record is silent on her education and intelligence, Perry was forty-two years old at the time of her arrest, and she was detained only briefly before she gave consent.  (Report 13.)  The only testimony in the record demonstrates that she gave consent sua sponte or in response to a single request by the officers.  (Report 4, 6-7.)

Perry argues that numerous facts "combine to present a situation where, under the totality of the circumstances, . . . [she] could not have consented voluntarily."  (Objections 4.) Specifically, Perry emphasizes that 1) the officers created an "inherently coercive and threatening atmosphere" because one was

carrying a shotgun, which he loaded while ascending the stairs; 2) both officers testified that she was in handcuffs when she gave consent; 3) no officer told Perry that she had the right to refuse a search; and 4) the officers did not present Perry with a "consent to search form" explaining her rights. (Id.)

In the Sixth Circuit, a "defendant must show more than a subjective belief of coercion, but also some objectively improper action on the part of the police.'" United States v. Higgins, 127 F. App'x 201, 204 (6th Cir. 2005) (quoting United States v. Crowder, 62 F.3d 782, 787 (6th Cir.1995)). The presence of armed police officers does not, by itself, create a coercive atmosphere. See, e.g., Higgins, 127 F. App'x at 204. Consent can be voluntary, even if officers are armed at the time consent is given. See Bradley, 163 F. App'x at 357 (concluding that a district court did not err in finding a defendant's consent voluntary where officers were armed but their weapons were not drawn). Although both officers were armed, neither officer had his gun drawn on Perry when she consented. (Report 7.) Parker had put his gun away. (Id.) Hendree's gun was hanging over his shoulder, not pointed at Perry. (See id.)

That Perry was handcuffed when she gave consent is also insufficient to invalidate that consent. See United States v. Burns, 298 F.3d 523, 541 (6th Cir. 2002) (citing United States v. Watson, 423 U.S. 411, 424 (1976)) (concluding that a

defendant gave voluntary consent, although he was handcuffed in a police car following his arrest); cf. Bradley, 163 F. App'x at 356 (concluding that consent was voluntary, although defendant was in custody at the time).

That Perry was not told she had a right to refuse a search or presented with a consent-to-search form arguably shows she was unaware of her right to refuse consent.  Although knowledge of the right to refuse consent is a relevant factor in the voluntariness analysis, "the government need not establish such knowledge as the sine qua non of an effective consent." Bustamonte, 412 U.S. at 227.  The failure to advise a person that she may refuse consent does not necessarily render that consent invalid.  See Canipe, 569 F.3d at 603-04.  Before she was arrested at the boarding house, Perry had been arrested fifty-seven times.  (Report 13 n.3.)  Because Perry was "no stranger to the police or the criminal justice system," it "defies common sense that [s]he merely acquiesced" in coercive demands by Hendree and Parker without knowledge of her right to refuse.  See id.

There is "no evidence of coercion" to rebut the Government's showing that Perry's consent was freely and voluntarily given.  See Capine, 569 F.3d at 604.  Considering the issue de novo, under the totality of the circumstances, the Court concludes that Perry's consent "was freely and voluntarily

given and was not the result of coercion, duress, or submission to a claim of authority." See Arnold, 486 F.3d at 213.  Perry's objection to the Magistrate Judge's finding of that fact is not well-taken.

Perry voluntarily consented to the search of her room. That consent alone is sufficient to deny her motion to suppress and to adopt the Magistrate Judge's Report.  Because Perry has also specifically objected to the Magistrate Judge's conclusion that the search of Perry's room constituted a lawful protective sweep, the Court will also review that decision de novo.

### C. Protective Sweep

Perry objects to the Magistrate Judge's conclusion that the officers' search of her room was a valid protective sweep under Maryland v. Buie, 494 U.S. 325, 334 (1990).  "A 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others." Buie, 494 U.S. at 327.  "While conducting a protective sweep, an officer may seize contraband found in plain view if its incriminating character is immediately apparent." United States v. Lanier, 285 F. App'x 239, 241 (6th Cir. 2008) (citing Horton v. California, 496 U.S. 128, 136 (1990)).

Under Buie, there are "two types of warrantless protective sweeps of a residence that are constitutionally permissible immediately following an arrest." United States v. Archibald,

17

589 F.3d 289, 295 (6th Cir. 2009) (citing <u>Buie</u>, 494 U.S. at 334-35).  As "a precautionary matter and without probable cause or reasonable suspicion," officers arresting a person in her home may "look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched."  <u>Buie</u>, 494 U.S. at 334.  To search beyond immediately adjoining places, however, "there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene."  <u>Id.</u>

The Magistrate Judge concluded that the protective sweep occurred in an area immediately adjacent to Perry's arrest. (Report 15-16.)  The Magistrate Judge also concluded that, regardless, there were articulable facts justifying the search of Perry's room.  (<u>Id.</u>)  In her objections, Perry argues that Hendree and Parker did not articulate specific facts showing that they had reason to believe Perry's room harbored an individual who posed a danger to those at the scene of her arrest.  (<u>See</u> Objections 4-5.)

As a "precautionary matter" <u>Buie</u> permits police officers to search "spaces immediately adjoining the place of arrest from which an attack could be immediately launched."  <u>Buie</u>, 494 U.S. at 334.  Such a sweep "requires no probable cause or reasonable

suspicion." _Archibald_, 589 F.3d at 295 (citing _Buie_, 494 U.S. at 334.

Because Perry was arrested in the hall just outside her room, her room constituted a "space[] immediately adjoining the place of her arrest." _See_ _id._ at 334. Because the door was open, Perry's room was a place "from which an attack could be immediately launched." _See_ _id._ Therefore, regardless of whether there were "articulable facts" that "would warrant a reasonably prudent officer in believing that" Perry's room harbored an "individual posing a danger to those on the arrest scene," their protective sweep was proper. _See_ _id._

Even if Perry's room had not immediately adjoined the place of her arrest, there were "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that" her room harbored "an individual posing a danger to those on the arrest scene." _See_ _Buie_, 494 U.S. at 334. The Sixth Circuit has concluded that police officers had reason to believe that another person was present based on "shuffling" sounds coming from an area near the place of arrest. _See_ _United States v. Taylor_, 248 F.3d 506, 510, 514 (6th Cir. 2001).

Before arriving at the boarding house, Hendree and Parker knew they were entering a volatile situation, an armed individual in a place where multiple people lived. (_See_ Report

19

6.)  Hendree testified that, when they arrived, someone was talking to Perry, and, when they arrested her in the hall, they did not know whether anyone else was present in Perry's room. (See id. at 16.)   Those articulable facts were at least as compelling as "shuffling" sounds in giving officers reason to suspect another individual's presence.  See Taylor, 248 F.3d at 514.   Therefore, even if Perry's room had not immediately adjoined the place of arrest, the officers' search would have been justified.  See Buie, 494 U.S. at 334-35.

Considering the issue de novo, the protective sweep of Perry's room was proper because her room immediately adjoined the place of arrest and because there were articulable facts giving the officers reason to believe another person might be present there.  See id.  Based on the foregoing, the protective sweep of Perry's room was proper.  Perry's objection to that conclusion by the Magistrate Judge is not well-taken.

### IV. Conclusion

For the foregoing reasons, the Court ADOPTS the Report and Recommendation of the Magistrate Judge and DENIES the Motion to Suppress.  All findings and conclusions of the Magistrate Judge not discussed above have not been specifically objected to and are adopted.

So ordered this 19th day of January, 2011.

s/ Samuel H. Mays, Jr.
SAMUEL H. MAYS, JR.
UNITED STATES DISTRICT JUDGE